UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

DEUSSARD JOSEPH GASPARD          CIVIL ACTION NO. 6:20-cv-00491

VERSUS                          JUDGE SUMMERHAYS

COMMISSIONER OF THE SOCIAL       MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision should be reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, Deussard Joseph Gaspard, fully exhausted his administrative remedies. He filed an application for disability insurance benefits, alleging disability beginning on September 6, 2011,[1] which was denied.[2] He then requested a hearing, which was held on May 3, 2019 before Administrative Law Judge Angelita Hamilton.[3] The ALJ issued a decision on May 28, 2019, concluding that Mr.

---

[1]     Rec. Doc. 8-1 at 135.

[2]     Rec. Doc. 8-1 at 58.

[3]     Rec. Doc. 8-1 at 32-57.

Gaspard was not disabled within the meaning of the Social Security Act from September 6, 2011 (the alleged disability onset date) through December 31, 2014 (the date he was last insured).[4]  Mr. Gaspard asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[6]  The claimant then initiated this action, seeking judicial review of the Commissioner's decision.

## Summary of Pertinent Facts

Mr. Gaspard was born on February 2, 1972.[7]  At the time of the ALJ's decision, he was forty-seven years old.  He completed the eleventh grade[8] and has work experience as a cook in a fast food restaurant, a roughneck in the oil field, and a garbage truck driver.[9]  He alleged that he has been disabled since September 6,

---

[4]     Rec. Doc. 8-1 at 21.

[5]     Rec. Doc. 8-1 at 4.

[6]     *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]     Rec. Doc. 8-1 at 59.

[8]     Rec. Doc. 8-1 at 37.

[9]     Rec. Doc. 8-1 at 37, 40-41, 175.

2011[10] due to complex regional pain syndrome ("CRPS") and nerve damage in his right knee.[11]

On September 16, 2011, Mr. Gaspard saw Dr. Robert L. Morrow, an orthopedic surgeon in Lafayette, Louisiana,[12] because he had hyperextended his right knee while at work a few days earlier. Mr. Gaspard had a prior history of a right lateral tibial plateau fracture that required an open reduction and internal fixation ("ORIF"). After the first surgery, he underwent a second procedure to remove the screws and accomplish a lateral retinacular release. He had been doing well before the recent accident. Dr. Morrow diagnosed post-traumatic effusion and discomfort of the right knee and scheduled an MRI. Dr. Morrow also said: "I don't think that he is able to return to work at this time because his work involves stepping up and off of a platform as well as stooping and lifting."

Mr. Gaspard had the MRI on October 4, 2011 and returned to see Dr. Morrow on October 13, 2011.[13] The MRI showed chondral irregularity at the central lateral tibial plateau, possibly due to the prior surgery, as well as "kissing" bone contusions involving the anterior lateral femoral condyle and anterior lateral/anterior central

---

[10]     Rec. Doc. 8-1 at 40, 174.

[11]     Rec. Doc. 8-1 at 59, 174.

[12]     Rec. Doc. 8-1 at 406-408.

[13]     Rec. Doc. 8-1 at 409-411.

tibial plateau with no visible displacement or depressed fracture.  There was also a small bone contusion of the outer circumference of the posterior superior medial femoral condyle.   Mr. Gaspard reported that he was most symptomatic with weightbearing, most comfortable when first waking up, and least comfortable at the end of the day.  He also reported recurrent effusion (or swelling) with a tingling sensation in his toes that went away with not bearing weight on his right leg. Examination revealed that the right knee felt stable, with no laxity of the ligaments, but there was slight effusion.  Dr. Morrow diagnosed pain and edema in the right knee, recommended that Mr. Gaspard take Aleve, and further recommended that he should remain off work.

When Mr. Gaspard returned to Dr. Morrow on January 23, 2012,[14] he reported that while standing in his kitchen on January 22, he pivoted to turn to his right and something inside his right knee popped.  He reported that it was very uncomfortable to put weight on his right leg, and he was using crutches.  X-rays did not show a fracture or loose body in the joint.  Dr. Morrow diagnosed status post right proximal tibial plateau fracture and ORIF with ongoing symptomatology and possible internal derangement.  Dr. Morrow recommended that Mr. Gaspard stop going to physical therapy, remain off work, continue using his crutches, use analgesic medication

---

[14]     Rec. Doc. 8-1 at 412-414.

including a Flector 1.3% transdermal patch, Tramadol, Aleve, Tylenol, and Relafen. He noted that an arthroscopic evaluation of the knee might be necessary.

Mr. Gaspard again saw Dr. Morrow on February 2, 2012.[15]  He continued to complain of pain and swelling in the right knee made worse by weightbearing.  Dr. Morrow stated that arthroscopy of the right knee was indicated, and he scheduled the procedure.

On February 13, 2012,[16] Mr. Gaspard underwent arthroscopy of the right knee with partial anteromedial meniscectomy, chondroplasty with microfracture of the medial femoral condyle, and shaving of the lateral tibial plateau cartilage, performed by Dr. Morrow.  Dr. Morrow's postoperative diagnoses were right medial femoral condyle cartilage, grade 3, defect; right anteromedial meniscus tear/scarring; and right lateral tibial plateau chondral defect (shortening).

An MRI of Mr. Gaspard's right knee obtained on May 29, 2012[17] showed chondral irregularity and fissuring of the central lateral tibial plateau with minimal subjacent subchondral cystic change that may be due to previous surgery, previous trauma, degenerative changes, or a combination thereof; evidence of a healed lateral tibial plateau fracture with slight posttraumatic deformity of the lateral tibial plateau

---

[15]     Rec. Doc. 8-1 at 415-417.

[16]     Rec. Doc. 8-1 at 398-405, 418-440.

[17]     Rec. Doc. 8-1 at 380-381.

but no significant tibial depression and no evidence of osteomyelitis; thickening of the skin compatible with cellulitis containing a large localized fluid collection that could be bursitis or an infection; and a small joint effusion.

Dr. Morrow's treatment notes of June 15, 2012[18] indicate that Mr. Gaspard continued to have difficulty with swelling of the right knee following surgery and reviewed the MRI findings. In Dr. Morrow's opinion, Mr. Gaspard had right lateral knee subcutaneous fluid accumulation and intermittent right lower extremity edema. He prescribed an antibiotic prophylactically. He also recommended an incision and drainage of the fluid around the knee. In his opinion, Mr. Gaspard was not able to return to work at that time. Dr. Morrow saw Mr. Gaspard again on June 19, 2012 and finalized the plan for the surgical draining of fluid around the knee.[19] The next day, June 20, 2012, Mr. Gaspard was hospitalized for incision and drainage of the right lateral knee subcutaneous fluid accumulation.[20]

When Mr. Gaspard saw Dr. Morrow again on October 26, 2012,[21] he was continuing to complain of recurrent swelling in the area where the fluid was removed. Dr. Morrow noted that Mr. Gaspard had a defined subcutaneous cystic

---

[18]    Rec. Doc. 8-1 at 355-357

[19]    Rec. Doc. 8-1 at 352-355.

[20]    Rec. Doc. 8-1 at 344-351, 358-397.

[21]    Rec. Doc. 8-1 at 298-300.

area that was persistently uncomfortable.  He scheduled surgery for the excision of the cystic mass.

Surgery was performed by Dr. Morrow on October 29, 2012 to excise a very large hemorrhagic cyst from the right lateral knee with insertion of a medium Hemovac drain.[22]  Dr. Morrow noted that the cyst was encased in quite a bit of scar tissue and was very difficult to remove.

On December 3, 2013, Mr. Gaspard consulted with Dr. Scott A. Gammel with regard to right leg pain.[23]  Mr. Gaspard reported that he had swelling and pain in his right leg that improved if he elevated his leg or stayed off it, "jumping of the leg," knots that became tender and appeared bruised, sensitivity to even light touch, occasional numbness and prickly feelings in the right foot, temperature changes, color changes, and coldness of the right foot.  He reported that Lortab helped his pain, but he did not like taking pain medication.  He reported fatigue related to lack of sleep secondary to pain.  Upon examination, Dr. Gammel found decreased range of motion of the right hip, right knee, and right ankle limited mostly by pain, allodynia along the right leg and foot, a one to two degree temperature difference between the legs, larger calf and thigh of the right leg as compared to the left leg, and decreased reflexes in the right leg.  Dr. Gammel's impression was probable

---

[22]     Rec. Doc. 8-1 at 287-343.

[23]     Rec. Doc. 8-1 at 505-512.

complex regional pain syndrome type 1, right lower extremity. He prescribed Neurontin, recommended range of motion exercises, and discussed with Mr. Gaspard possible treatment with lumbar sympathetic blocks and spinal cord stimulation. Dr. Gammel increased Mr. Gaspard's Neurontin dosage on December 17, 2013.[24]

Mr. Gaspard had lumbar sympathetic blocks on February 4, 2014[25] and February 19, 2014.[26] But when he saw Dr. Gammel's nurse practitioner on March 18, 2014,[27] Mr. Gaspard reported that his pain had worsened. Neurontin was discontinued and Gralise was prescribed. His gait was described as steady, slow, and antalgic, and he was using a cane to assist with ambulation. A third lumbar sympathetic block was administered on April 30, 2014.[28]

When Mr. Gaspard saw Dr. Gammel on May 21, 2014,[29] he reported that his leg "hurts all the time." Dr. Gammel noted that Mr. Gaspard had experienced no

---

[24]    Rec. Doc. 8-1 at 491-493.

[25]    Rec. Doc. 8-1 at 264-286.

[26]    Rec. Doc. 8-1 at 246-263.

[27]    Rec. Doc. 8-1 at 488-490.

[28]    Rec. Doc. 8-1 at 215-239.

[29]    Rec. Doc. 8-1 at 485-487.

sustained improvement, was continuing to have swelling and pain in his right leg, and his function had declined. Mr. Gaspard requested a trial spinal cord stimulator.

Mr. Gaspard returned to Dr. Gammel on September 3, 2014.[30] He continued to complain of pain and swelling in the right leg. His gait was again described as steady, slow, and antalgic, and he was using a cane. It was noted that he was unable to tolerate Neurontin for neuropathic pain. Elavil was added to help him sleep and Robaxin and Norco were prescribed. He was encouraged to elevate his leg as much as possible.

On December 1, 2014,[31] Mr. Gaspard reported that Robaxin and Elavil were helping. His gait remained slow and steady. His insurer had denied a spinal cord stimulator trial.

On February 24, 2015,[32] Mr. Gaspard reported to Dr. Gammel's nurse practitioner that his right knee pain was getting progressively worse, making sounds, and giving out. His right leg and foot were objectively colder than the left. The toes on his right foot were a bluish color.

---

[30]    Rec. Doc. 8-1 at 482-484.

[31]    Rec. Doc. 8-1 at 479-481.

[32]    Rec. Doc. 8-1 at 473-476.

Mr. Gaspard continued to treat with Dr. Gammel, taking the same medications and reporting the same symptoms, through October 2016.[33] Dr. Gammel's diagnosis remained complex regional pain syndrome type 1 of right lower limb as well as chronic pain syndrome.

On May 3, 2019, Mr. Gaspard testified at a hearing regarding his symptoms and his medical treatment. He explained that, since the accident in September 2011, his right leg had tended to swell and give out on him, causing him to fall. He testified that he had constant pain every day and that the more he walked, the more his leg would swell. He stated that he took Norco (for pain), Robaxin (a muscle relaxer), and Amitriptyline (to help with sleep). He complained that the Norco knocks him out. He explained that he typically sat in his recliner all day, elevating his leg. He stated that he used a cane when walking. He stated that he could sit comfortably for only about ten to fifteen minutes and could stand for only about five minutes. He claimed to have difficulty bending and stooping. He reported that he saw his pain management doctor every three months. He reported that a cortisone injection in his knee about a week before the hearing did not help. He stated that cold weather made his knee pain worse. Mr. Gaspard testified that he had a driver's license but did not drive because bending his knee is painful and his leg tended to jump about. He

---

[33]     Rec. Doc. 8-1 at 446-469.

estimated that he could drive for only about half an hour.  He testified that he had difficulty sleeping due to the pain.  He explained that he had been diagnosed with complex regional pain syndrome after repeated knee surgeries.

Mr. Gaspard now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.  Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[34]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[35]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[36]

---

[34]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[35]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[36]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[37]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[38]  Conflicts in the evidence[39] and credibility assessments[40] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[41]

**B.    <u>Entitlement to Benefits</u>**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[42]  A person is disabled "if he is

---

[37]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[38]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[39]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[40]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[41]    *Wren v. Sullivan*, 925 F.2d at 126.

[42]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[43]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[44]

**C.    <u>Evaluation Process and Burden of Proof</u>**

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[45]

---

[43]    42 U.S.C. § 1382c(a)(3)(A).

[44]    42 U.S.C. § 1382c(a)(3)(B).

[45]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[46] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[47]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[48]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[49]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[50]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[46]    20 C.F.R. § 404.1520(a)(4).

[47]    20 C.F.R. § 404.1545(a)(1).

[48]    20 C.F.R. § 404.1520(e).

[49]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[50]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[51]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[52]

## D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that the claimant did not engage in substantial gainful activity between his alleged disability onset date of September 6, 2011 through his date last insured, which was December 31, 2014.[53]  This finding is supported by substantial evidence in the record and was not challenged by the claimant.

At step two, the ALJ found that the claimant has the following severe impairments:  fracture of the lower extremity and right knee dysfunction.[54]  While substantial evidence in the record supports the ALJ's finding that these two impairments are severe, the ALJ failed to determine whether Mr. Gaspard's complex regional pain syndrome is a severe impairment.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed

---

[51]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5ᵗʰ Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[52]     20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5ᵗʰ Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5ᵗʰ Cir. 1987)).

[53]     Rec. Doc. 8-1 at 15.

[54]     Rec. Doc. 8-1 at 15.

impairment.[55]   Although the claimant did not challenge this finding, the ALJ's failure to determine whether Mr. Gaspard's complex regional pain syndrome is a severe impairment undermined this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except for the following:  he can never climb ladders, ropes, or scaffolds but could occasionally climb ramps and stairs; he can occasionally balance, stoop, kneel, crouch, or crawl; he must avoid all exposure to hazards such as moving machinery, raw chemicals and solutions, and unprotected heights; and he is limited to jobs that can be performed while using a hand-held assistive device such as a cane.  The claimant challenged this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[56]  This finding is supported by substantial evidence in the record, and the claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from September 6, 2011 through December 31, 2014 (the date last insured) because there are jobs in the national economy that he can perform.[57]  The claimant challenged this finding.

---

[55]     Rec. Doc. 8-1 at 15.

[56]     Rec. Doc. 8-1 at 19.

[57]     Rec. Doc. 8-1 at 21.

### E.    The Allegations of Error

Mr. Gaspard contends that the ALJ erred (1) in failing to consider all of his impairments when evaluating his residual functional capacity; and (2) in determining that he retains the functional capacity to do sedentary work.  These allegations of error are closely intertwined and will be considered simultaneously.

### F.    The ALJ Erred in Failing to Consider All of Mr. Gaspard's Impairments When Evaluating his Residual Functional Capacity

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[58]    The ALJ is responsible for determining a claimant's residual functional capacity.[59]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[60]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[61]

---

[58]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[59]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[60]    *Martinez v. Chater*, 64 F.3d at 176.

[61]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[62]

The ALJ found that Mr. Gaspard had two severe impairments – fracture of lower extremity and right knee dysfunction. The ALJ did not discuss any other impairments. The ALJ acknowledged, however, that Mr. Gaspard applied for benefits because of complex regional pain syndrome ("CRPS"). The ALJ also mentioned twice in her residual functional capacity evaluation that Mr. Gaspard was diagnosed with that condition. However, at step two of the sequential analysis, the ALJ neither listed CRPS among Mr. Gaspard's severe impairments nor explained why she found that this is not a severe impairment.

Although CRPS is not a listed impairment, the Social Security Administration has recognized that CRPS "constitutes a medically determinable impairment when it is documented by appropriate medical signs, symptoms, and laboratory findings" and "may be the basis for a finding of 'disability.'"[63] Social Security Ruling 03-2p

---

[62] *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

[63] SSR 03-2P, "Titles II And XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome," 2003 WL 22814447, at *4 (October 20, 2003).

defines CRPS as "a chronic pain syndrome most often resulting from trauma to a single extremity" and explains that "[i]t is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual."[64]  This ruling also states that CRPS can be established based on persistent complaints of pain accompanied by one or more of certain clinically documented signs including swelling, changes in skin color or temperature, abnormal hair or nail growth, osteoporosis, or involuntary movements of the affected bodily region.[65]  Mr. Gaspard often complained to his doctors of pain, swelling, and involuntary movements of his right leg.  Dr. Gammel's treatment notes documented clinical evidence of swelling, changes in both skin color and skin temperature, and allodynia.  Therefore, the objective criteria for CRPS are satisfied in this case. Because Mr. Gaspard had a definitive diagnosis of CRPS by a treating physician, as well as clinical findings of severe pain and swelling in his right leg during the period of alleged disability, this Court finds that Mr. Gaspard's CRPS is a medically determinable impairment, which should have been evaluated at step two of the sequential analysis.

When a claimant is diagnosed with CRPS, a medically determinable impairment has been established and an ALJ's failure to address it during the

---

[64]     SSR 03-2P, 2003 WL 22814447, at *1.

[65]     SSR 03-2P, 2003 WL 22814447, at *2.

sequential evaluation process constitutes reversible error.[66]   Here, Dr. Gammel diagnosed Mr. Gaspard with CRPS, and there does not appear to be any evidence in the record that contradicts Dr. Gammel's determination.  Mr. Gaspard consistently complained of and was treated for pain in his right knee, leg, and foot that began following the injury in September 2011.  Dr. Gammel's treatment notes also document swelling and changes in the color and temperature of Mr. Gaspard's right leg and foot.  Mr. Gaspard was first diagnosed with CRPS in December 2013, more than a year before his date last insured, and the condition persisted for more than a year and at least through 2016.

SSR 03-2p states that CRPS should be evaluated "using the sequential evaluation process, just as for any other impairment."[67]  Critically, "once the disorder has been established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."[68]   In evaluating the residual functional capacity of an individual with CRPS, SSR 03-2p requires that "[c]areful consideration must be

---

[66]     See, e.g., *Scott v. Colvin*, No. 15-404-JWD-EDW, 2017 WL 1243154, at *8 (M.D. La. Feb. 24, 2017), report and recommendation adopted, 2017 WL 970271 (M.D. La. Mar. 13, 2017); *Welch v. Colvin*, No. 3:14cv388-DJP-LRA, 2015 WL 4940666, at *6 (S.D. Miss. Aug. 19, 2015).

[67]     SSR 03-2P, 2003 WL 22814447, at *6.

[68]     SSR 03-2P, 2003 WL 22814447, at *6.

given to the effects of pain and its treatment on an individual's capacity to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."[69]  Because the ALJ did not list CRPS as a severe impairment or explain why it was not a severe impairment, it is not clear that the ALJ carefully considered the effects of pain and its treatment on Mr. Gaspard's capacity to do sustained work-related activities, as required by SSR 03-2p.  Therefore, this Court finds that the ALJ erred in failing to address the CRPS at step two of the sequential analysis process and again by failing to evaluate the condition in accordance with SSR 03-2p.

This error was not harmless because it affected the ALJ's determinations at the remaining steps of the sequential evaluation process.  In particular, the ALJ did not consider how Mr. Gaspard's CRPS affects his residual function capacity.  When making a determination regarding a claimant's residual functional capacity, the ALJ is required to consider the medical opinions in the claimant's record and the relevant evidence received, and then weigh the credibility of the evidence accordingly.[70] Opinions from treating physicians are generally entitled to significant weight, but the opinions from examining physicians must also be considered.[71]  This Court finds

---

[69]     SSR 03-2P, 2003 WL 22814447, at *7.

[70]     20 C.F.R. §§ 404.1520(e), 404.1527(b), 404.1527(c).

[71]     20 C.F.R. § 404.1527(c)(2); *Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017).

that the ALJ's failure to evaluate Mr. Gaspard's CRPS in accordance with SSR 03-2p at step two necessarily undermined the ALJ's determinations regarding the medical opinion evidence, Mr. Gaspard's credibility, and his residual functional capacity assessment. Notably, Dr. Gammel opined in May 2014 that Mr. Gaspard's functionality had declined, but the ALJ apparently gave no weight to Dr. Gammel's opinions. The ALJ did not state how much weight she gave to Dr. Gammel's opinions and deferred instead to the state agency medical consultant, Dr. Honigman, who did not examine Mr. Gaspard, to whom she gave "substantial weight." It seems that the ALJ's failure to consider CRPS as a distinct condition or impairment resulted in a discounting of Dr. Gammel's medical opinions in contravention of the regulation requiring that all medical opinions must be weighed and evaluated.

Because the ALJ failed to consider CRPS at step two and failed to consider the medical evidence regarding the effect of CRPS on Mr. Gaspard's functionality when evaluating his residual functional capacity, this Court finds that the ALJ's decision is not supported by substantial evidence and is not based upon the proper legal standards.

## **Conclusion and Recommendation**

For the foregoing reasons, this Court recommends that the Commissioner's decision should be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to (1) determine whether

Mr. Gaspard's CRPS is a severe impairment, (2) determine whether his CRPS when combined with his other impairments meets or medically equals a listing, and (3) reevaluate his residual functional capacity, taking his CRPS into account. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[72]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual

---

[72]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[73]

Signed in Lafayette, Louisiana, this 19th day of March 2021.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[73]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).